David M. Neff, IL Bar No. 6190202
(*admitted pro hac vice*)
DNeff@perkinscoie.com
Amir Gamliel, CA Bar No. 268121
AGamliel@perkinscoie.com
PERKINS COIE LLP
1888 Century Park E., Suite 1700
Los Angeles, CA  90067-1721
Telephone:  310.788.9900
Facsimile:  310.788.3399

Attorneys for Lender
Wilmington Trust, National Association, as Trustee,
for the benefit of the Holders of COMM 2016-DC2
Mortgage Trust Commercial Mortgage Pass
Through Certificates, Series 2016-DC2

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

## NORTHERN DIVISION

| | |
|---|---|
| In re<br><br>Cinema Square, LLC,<br><br>               Debtor. | Case No.  9:21-BK- 10634-DS<br><br>Chapter: 11<br><br>**LENDER'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR RELIEF FROM THE AUTOMATIC STAY**<br><br>Date:        February 8, 2022<br>Time:        11:30 AM<br>Judge:      Deborah J. Saltzman<br>Courtroom: 1415 State Street<br>               Court room 201<br>               Santa Barbara, CA 93101<br>               via Zoom.gov |

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ....................................................................................................... 1

II.   STATEMENT OF FACTS ......................................................................................... 3

III.  DISCUSSION ............................................................................................................ 8

    A.   "Cause" Exists to Grant Relief from Stay Under Section 362(d)(1) ..................... 8

        1)   Two-Party Dispute ....................................................................................... 9

        2)   Inability to Confirm a Plan......................................................................... 10

        *a.*   *Lender's Consent Required to Confirm Plan*............................................ 11

        *b.*   *Debtor Unable to Propose a Feasible Plan*.............................................. 12

        *c.*   *Reinstatement Not Possible*....................................................................... 15

    B.   Relief from Stay is Warranted Pursuant to Section 362(d)(2) Because Debtor Lacks Equity in the Property and Cannot Successfully Reorganize......... 16

        1.   There Is No Equity in the Property ............................................................ 17

        2.   The Property is Not Necessary to an Effective Reorganization Because Debtor Cannot Confirm a Plan in a Reasonable Time................ 17

IV.   CONCLUSION ......................................................................................................... 18

Lender's Memorandum in Support of Motion
for Relief from Automatic Stay

154968672.6

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Albany Partners, Ltd. v. Westbrook (In re Albany Partners, Ltd.)*,
    749 F.2d 670 (11th Cir. 1984)....................................................................9

*Barclays-Am./Bus. Credit, Inc. v. Radio WBHP, Inc. (In re Dixie Broad., Inc.*,)
    871 F.2d 1023 (11th Cir. 1989)....................................................................9

*Cedar Shore Resort, Inc. v. Mueller (In re Cedar Shore Resort, Inc.*,)
    235 F.3d 375 (8th Cir. 2000)....................................................................10

*Cinema Square, LLC v. Jeffries Loancore, LLC, et al.* ....................................................................6

*Duvar Apt., Inc. v FDIC (In re Duvar Apt., Inc)*.,
    205 B.R. 196 (B.A.P. 9th Cir. 1996)....................................................................9

*Fid. Assurance Ass'n v. Sims*,
    318 U.S. 608 (1943)....................................................................11

*Frankford Trust Co. v. Dublin Props. (In re Dublin Props.)*,
    12 B.R. 77 (Bankr. E.D. Pa. 1981)....................................................................9, 17

*In re 3 Ram Inc.*,
    343 B.R. 113 (Bankr. E.D. Pa. 2006)....................................................................11

*In re 3MB, LLC*,
    609 B.R. 841 (Bankr. E.D. Calif. 2019)....................................................................17

*In re 4th Street E. Inv'rs, Inc.*,
    2012 WL 1745500 (Bankr. C.D. Cal. May 15, 2012)....................................................................12

*In re 53 Stanhope LLC*,
    625 B.R. 573 (Bankr. S.D.N.Y. 2021)....................................................................17

*In re Charter Communications*,
    419 B.R. 221 (Bankr. S.D.N.Y. 2009)....................................................................16

*In re Dev., Inc.*,
    36 B.R. 998 (Bankr. D. Haw. 1984) ....................................................................9, 17

*In re Drexel Burnham Lambert Group, Inc.*,
    138 B.R. 723 (Bankr. S.D.N.Y. 1992)....................................................................13

*In re Eden Assocs.*,
    13 B.R. 578 (Bankr. S.D.N.Y. 1981) ....................................................................11

Lender's Memorandum in Support of Motion
for Relief from Automatic Stay

# TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*In re Egea*,
    167 B.R. 226 (Bankr. D. Kan. 1994) ........................................................17

*In re L&J Anaheim Assoc's*,
    995 F.2d 940 (9th Cir. 1993) ...................................................................16

*In re Marsh*,
    36 F.3d 825 (9th Cir. 1994) .......................................................................9

*In re New Invs., Inc.*,
    840 F.3d 1137 (9th Cir. 2016) ...........................................................16, 17

*In re NNN Parkway*,
    505 B.R. 277 (C.D. Cal. 2014) ................................................................12

*In re Prometheus Health Imaging, Inc.*,
    705 F. App'x 626 (9th Cir. 2017) ..............................................................9

*In re Reid Park LLC*,
    2012 WL 5462919 (Bankr. D. Ariz. July, 18, 2012) ...............................12

*In re Teresi*,
    134 B.R. 392 (Bankr. E.D. Cal. 1991) .....................................................18

*In re Walter*,
    108 B.R. 244 (Bankr. C.D. Cal. 1989) .......................................................9

*Laguna Assocs. Ltd. P'Ship v. Aetna Cas. & Sur. Co. (In re Laguna Assocs. Ltd.
    P'ship)*,
    30 F.3d 734 (6th Cir. 1994) .......................................................................9

*Oasis at Wild Horse Ranch, LLC v. Sholes (In re Oasis at Wild Horse Ranch,
    LLC)*,
    2011 WL 4502102 (9th Cir. B.A.P. Aug. 26, 2011) ..................................9

*Official Comm. of Unsecured Creditors v. SGL Carbon Corp. (In re SGL Carbon
    Corp.)*,
    200 F.3d 154 (3d Cir. 1999) .......................................................................9

*Pegasus Agency, Inc. v. Grammatikakis (In re Pegasus Agency, Inc.)*,
    101 F.3d 882 (2d Cir. 1996) .....................................................................18

*Shapiro v. Wilgus*,
    287 U.S. 348 (1932) ...................................................................................9

Lender's Memorandum in Support of Motion
for Relief from Automatic Stay

154968672.6

# TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*Stewart v. Gurley*,
745 F.2d 1194 (9th Cir. 1984)..................................................................................18

*Sun Valley Ranches, Inc. v. Equitable Life Assurance Soc'y of the United States (In
re Sun Valley Ranches, Inc.)*,
823 F.2d 1373 (9th Cir. 1987)..................................................................................18

*United Savings Ass'n of Texas v. Timbers of Inwood Forest Assoc's, Ltd*,
484 U.S. 365.............................................................................................................18

*Walter E. Heller W., Inc. v. Faires (In re Faires)*,
34 B.R. 549 (Bankr. W.D. Wash. 1983) .....................................................................9

*Wilmington Trust, National Association, as Trustee, etc. v. Cinema Square, LLC* .........................6

*Worthington v. General Motors Corp. (In re Claremont Acquisition Corp., Inc.)*,
113 F.3d 1029 (9th Cir. 1997)..................................................................................16

*Wright v. Vinton Branch of Mountain Trust Bank of Roanoke, VA*,
300 U.S. 440 (1937)................................................................................................11

**STATUTES**

11 U.S.C. § 362(d) ....................................................................................8, 17, 18

11 U.S.C. § 362(d)(1) ...................................................................................1, 9

11 U.S.C. § 362(d)(2) ...............................................................................17, 18

11 U.S.C. § 362(g) ......................................................................................9, 17

11 U.S.C. § 1107(a) ...........................................................................................7

11 U.S.C. § 1108 ...............................................................................................7

11 U.S.C. § 1112(b) ..........................................................................................9

11 U.S.C. § 1123(d) ........................................................................................16

11 U.S.C. §1124(2) .........................................................................................16

11 U.S.C. § 1129(a)(10) ................................................................................11

11 U.S.C. § 1129(a)(11) ................................................................................13

-iv-

154968672.6

Wilmington Trust, National Association, as Trustee, for the benefit of the Holders of COMM 2016-DC2 Mortgage Trust Commercial Mortgage Pass Through Certificates, Series 2016-DC2 ("***Lender***") respectfully moves this Court (the "***Lift Stay Motion***"), pursuant to sections 362(d)(1) and (2) of the Bankruptcy Code, for an order granting Lender relief from the automatic stay to enforce its rights and remedies against debtor Cinema Square LLC ("***Debtor***") under the Loan Documents (as defined below), including by foreclosing on Debtor's theater-anchored multi-tenant building located at 7917 El Camino Real, Atascadero, California (the "***Property***"). Lender submits this memorandum of points and authorities (the "***Memorandum***") and the concurrently filed *Declaration of Kendall Green* ("***Green Decl.***"), *Declaration of Steven Evans* ("***Evans Decl.***") and *Declaration of Amir Gamliel* ("***Gamliel Decl.***) in support of the Lift Stay Motion.

## I.    INTRODUCTION

Debtor has made little progress in its operations in the six months it has been in Chapter 11, with only three of eight spaces in its building being occupied and its largest tenant by far — Galaxy Theater — paying substantially reduced rent.  Since the Debtor purchased the Property in 2015, its value has deteriorated significantly — declining from $13 million to $7.4 million, based on Lender's appraisal by Cushman &Wakefield as of December 1, 2021 (the "***C&W Appraisal***"). *See* Evans Decl. <u>Ex. A</u>. Debtor must now propose a plan of reorganization grounded in that realistic valuation, not in its overly optimistic projections. As explained in more detail below, the Property's current valuation leaves Lender substantially undersecured and in light of Debtor's other negligible debts, it is apparent that Debtor cannot confirm a plan without Lender support.

Indeed, this case is really just a dispute between Debtor and Lender because other claims in this case are *de minimus* compared to Lender's claim. The other secured creditor, the SBA, has filed a proof of claim for $155,563.36 on account of an Economic Injury Disaster Loan ("***EIDL***"), which requires monthly installment payments of just $713.00 and matures in 2050. *See* Claim Register, Claim 4-1. The SBA holds a junior security interest to Lender's claim and accordingly, is entirely unsecured. Additionally, Debtor has just eight unsecured creditors with claims totaling only $26,395.10. Two of those creditors have claims in unknown amounts and

four are ostensibly providing ongoing professional services (management, accounting, survey and solar) pursuant to executory contracts that would likely be assumed with their defaults cured. Debtor could have paid all these creditors prior to commencing this case, as it had $220,740.84 cash on hand.[1]

Lender holds a deficiency claim of at least $2.2 million, more than 12 times the combined amount of all other unsecured claims, including the SBA.[2] Although Lender's claim is guaranteed by Debtor's principal member, Jeffrey Nelson (who denies having executed a written guaranty), he claims to be judgment proof. Thus, Lender's deficiency claim will have to be classified with the other unsecured claims (including the SBA), rendering Debtor unable to obtain an accepting impaired class for its plan.

Debtor's also is incapable to showing that it can generate sufficient revenues to make its plan feasible. Only three of its eight retail spaces are operational.[3] Its largest tenant, Galaxy Theater, has negotiated a series of short-term, below-market leases with Debtor, which Debtor admits in a recent pleading will not be adequate to prove plan feasibility.[4] And four of its retail spaces are in poor condition, with vacancies dating back to 2018. But for Debtor's lifeline — two non-recurring Shuttered Venue Operators Grants[5] totaling $795,814.20 from the U.S. Small

---

[1]    As of December 8, 2021, only four claims appeared in the Court's Claims Register:  Claim No. 1 was filed by Debtor's state court counsel, Butler Fitzgerald Fiveson & McCarthy, P.C., in the amount of $5,680; Claim No. 2 was filed by Lender as secured in the amount of $9,616,613.28; Claim No. 3 was a contingent claim filed by Galaxy Theater in an unknown amount; and Claim No. 4 was filed by the U.S. Small Business Administration as secured in the amount of $155,563.36.

[2]    While Debtor's Bankruptcy Schedules valued the Property at $13 million (*see* Docket No. 31), Debtor obtained Court approval to hire an appraiser on July 12, 2021, in order to procure a contemporary valuation. [Docket No. 46].  Since then, Debtor has failed to produce to Lender any appraisal report.

[3]    On or about May 14, 2021, a fourth tenant, Yogurt Creations Inc., signed a three-year lease with Debtor.  At present, the business remains closed, the tenant has not regularly made rent payments and, according to the written lease, it is entitled to $30,000 in tenant improvements.  Gamliel Decl., ¶5.

[4]    *See* [Docket No. 99] ("Not only will the Debtor share in that high, but gives hope that the movie-going industry might be on the rebound, which would ***permit the signing of a long-term lease, which the Debtor agrees will be a necessary component of proving feasibility***.") (emphasis added).  Lender has approved short-term, below market lease extensions thus far to preserve its collateral.

[5]    While Debtor has initiated an adversary proceeding against Galaxy Theater to collect $1,199,296.00 in unpaid rent from May 2020 through July 2021, Galaxy Theater is reportedly an insolvent, judgment-proof single purpose entity.  The action remains at the pleading stage as a result of a short-term stay agreed upon by Debtor and Galaxy

Lender's Memorandum in Support of Motion
for Relief from Automatic Stay
-2-
154968672.6

Business Administration — its current revenues could barely support payment of debt service, operating expenses, property taxes and insurance, much less the ongoing costs of administering this case. Unless or until Galaxy Theater agrees to pay market rent — which it maintains is impossible based upon existing sales revenue — Debtor's financial outlook remains grim for the foreseeable future. With its principal unable to infuse new equity into the estate, the Court should no longer avail Debtor of the benefits of the automatic stay when its apparent objective is to frustrate Lender's rights and remedies. For these reasons, as discussed in more detail below, Lender respectfully requests that the Court grant its Lift Stay Motion.

## II.    STATEMENT OF FACTS

**A.    The Loan**

On or about December 31, 2015, Jeffries Loancore LLC, a Delaware limited liability company ("***Original Lender***") made a $7,800,000.00 loan (the "***Loan***") to Debtor. The Loan is evidenced by, among other instruments, that certain Promissory Note dated December 31, 2015, executed by Debtor in favor of Original Lender in the original principal sum of $7,800,000.00 (the "***Note***"). Green Decl., Ex. A. The Loan is also evidenced by that certain Loan Agreement dated as of December 31, 2015, by and between Debtor and Original Lender (the "***Loan Agreement***"). Green Decl., Ex. B.

The Loan is secured by, among other things: (i) that certain Deed of Trust, Assignment of Leases and Rents and Security Agreement, dated as of December 31, 2015 (the "***Deed of Trust***"), executed by Debtor, as trustor, to Fidelity National Title Company, as trustee, for the benefit of Original Lender, as beneficiary; and (ii) that certain Assignment of Leases and Rents, dated December 31, 2015 (the "***Assignment of Rents***"), executed by Debtor, as assignor, to Original Lender, as assignee. The Deed of Trust was recorded in the Official Records of San Luis Obispo County, California (the "***Official Records***") on December 31, 2015. The Assignment of Rents

---

Theater.  Since the Shuttered Venue Operators Grant was intended to compensate Debtor for Galaxy Theater's failure to pay rent while its business remained partially open or closed altogether, any recovery against Galaxy Theater would presumably be offset by the grant funds received to date.

Lender's Memorandum in Support of Motion
for Relief from Automatic Stay
-3-
154968672.6

1   was also recorded in the Official Records on December 31, 2015.  Green Decl., Ex. C, D.[6]

2   **B.      The Loan is Assigned to Lender**

3          Effective as of March 21, 2016, Original Lender assigned the Loan Documents to Lender

4   pursuant to: (i) that certain Assignment of Deed of Trust, Assignment of Leases and Rents and

5   Security Agreement (the "***Assignment of DOT***"), recorded in the Official Records on April 18,

6   2016; and (ii) that certain Assignment of Assignment of Leases and Rents (the "***Assignment of***

7   ***Assignment of Leases and Rents***"), recorded in the Official Records on April 18, 2016.

8   Accordingly, Lender is now the holder of the Note, beneficiary under the Deed of Trust, and

9   secured party and/or assignee under all of the other Loan Documents.  Green Decl., Ex. E, F.

10  **C.      The Loan Obligations**

11         Pursuant to the Loan Documents, Debtor promised to pay to Lender monthly installments

12  of principal, interest, escrows and reserves on the sixth day of each calendar month commencing

13  on February 6, 2016. The principal balance together with all accrued but unpaid interest would be

14  due and payable on January 6, 2026 (the "***Maturity Date***"). Section 8.1(a) of the Loan Agreement

15  provides that an "Event of Default" shall occur if Debtor fails to repay any portion of the Loan,

16  including Debtor's monthly payments, when due. Under Section 8.1(d) of the Loan Agreement,

17  encumbering the Property without Lender's consent also constitutes an "Event of Default."

18  Pursuant to Section 2.2.2 of the Loan Agreement, in the event of an occurrence of an Event of

19  Default, interest shall accrue on the Loan at the Default Rate (as defined in the Loan Agreement).

20         In Section 2 of the Deed of Trust, and Section 2(a) of the Assignment of Rents, Debtor

21  made an absolute and irrevocable assignment to Lender of all the "Rents and Profits" (as defined

22  in the Assignment of Rents) generated by the Property. Pursuant to Section 2 of the Deed of Trust

23  and Section 2(a) of the Assignment of Rents, Lender granted a revocable license to Debtor to

24  collect and retain the Rents and Profits. Additionally, pursuant to Section 2 of the Deed of Trust

25  and Section 2(b) of the Assignment of Rents, upon the occurrence of an Event of Default, the

26

27  _____

28  [6]   The Note, the Loan Agreement, the Deed of Trust, the Assignment of Rents, and all other documents evidencing,
        securing or relating to the Loan are sometimes collectively referred to herein as the "Loan Documents."

Lender's Memorandum in Support of Motion
for Relief from Automatic Stay

154968672.6

license granted to Debtor would be automatically revoked and Lender would immediately be entitled to collect the Rents and Profits.

Under Section 9 of the Assignment of Rents, Debtor is required to reimburse Lender for all costs and expenses incurred by Lender, including attorneys' fees, with respect to, among other things, the exercise of Lender's remedies under the Loan Documents.

**D.     Events Leading to Bankruptcy Filing**

Commencing on May 6, 2020, Debtor failed to make its monthly payments due on the Loan. Accordingly, an Event of Default has occurred under the Loan.  In addition, on or about June 16, 2020, Debtor caused a non-monetary Event of Default to occur when it obtained a $150,000 U.S. Small Business Administration loan secured by Lender's collateral without obtaining Lender's prior consent.   Lender first learned of the junior lien from Debtor's Bankruptcy Schedules and Statements. Green Decl., ¶ 8.

On or about July 2, 2020, Lender notified Debtor of its Events of Default (the "***Demand Letter***") and demanded all amounts due under the Loan. Since receiving the Demand Letter, Debtor has failed to pay all amounts due under the Loan Documents. Green Decl., ¶ 9. Accordingly, as of the Petition Date, Debtor owed Lender at least $9,616,613.28 in principal, interest, late fees, tax and reserves, default interest, advances, attorneys' fees and other costs and expenses. *See* Claim Register, Claim 2.

On October 27, 2020, Lender commenced a non-judicial foreclosure against the Property by recording a Notice of Default and Election to Sell under Deed of Trust, Assignment of Leases and Rents and Security Agreement (the "***Notice of Default***"). Green Decl., ¶ 10.

On December 3, 2020, Lender filed a complaint captioned *Wilmington Trust, National Association, as Trustee, etc. v. Cinema Square, LLC*, in the San Luis Obispo County Superior Court, Case No. 20CVP-0379 (the "***Receivership Lawsuit***"), seeking (1) the appointment of a receiver, accounting and specific performance of the rents-and-profits clause; and (2) injunctive relief.  Cinema Square vigorously opposed the relief requested by the Lender, including by filing a cross-complaint for declaratory and injunctive relief against Lender. Green Decl., ¶ 11.

On February 5, 2021, Cinema Square also filed a complaint captioned *Cinema Square,*

Lender's Memorandum in Support of Motion
for Relief from Automatic Stay
-5-
154968672.6

*LLC v. Jeffries Loancore, LLC, et al.*, before the Supreme Court of the State of New York, Index No. 650645 (the "***Injunction Action***"), seeking to enjoin Lender from enforcing the Loan under common law force majeure, impossibility of performance and frustration of purpose resulting from the Covid-19 pandemic. On February 11, 2021, the New York court entered a Decision and Order denying Cinema Square's motion for a preliminary injunction in the Injunction Action. On June 8, 2021, the court in the Receivership Lawsuit ordered the appointment of a receiver but agreed to Lender's request to stay its effectiveness until June 15, 2021 as Lender was scheduled to complete a non-judicial foreclosure sale on that date. On June 14, 2020, Debtor filed for relief under Chapter 11, staying the foreclosure sale. Green Decl., ¶ 12.

**E.    Guarantor Lawsuit**

On August 3, 2021, Lender sued Nelson under his Guaranty of Recourse Obligations dated December 31, 2015 (the "***Recourse Guaranty***"). Nelson had guaranteed full, prompt, and complete payment of the Loan upon the occurrence of a "Springing Recourse Event," which is defined to include the filing by Cinema Square of a bankruptcy petition. Green Decl., ¶13. Nelson, a lawyer, has challenged the genuineness of the Guaranty, notwithstanding admitting his signature appears on the Guaranty. Nelson also contends that he is a retiree and is effectively judgment proof.  Gamliel Decl., ¶ 6.

On September 2, 2021, Nelson filed a complaint with the Consumer Financial Protection Bureau against Lender's special servicer, CW Capital Asset Management, LLC, notwithstanding that the Loan constitutes a commercial, not consumer, loan. While Nelson maintains that he is judgment proof, he has gone to great lengths, including through pre-petition pleas for local politicians to intervene, to forestall Lender's enforcement remedies under the Loan Documents. Green Decl., ¶ 14.

**F.    Debtor's Bankruptcy**

On June 14, 2021 (the "***Petition Date***"), Debtor filed a voluntary petition for relief under the Bankruptcy Code in the United States Bankruptcy Court for the Central District of California (the "***Bankruptcy Court***"). Debtor continues to operate and manage its business as debtor-in-possession pursuant to §§ 1107(a) and 1108 of the Bankruptcy Code.

Lender's Memorandum in Support of Motion
for Relief from Automatic Stay
-6-
154968672.6

On June 24, 2021, the Bankruptcy Court entered an ordering approving the Cash Collateral Stipulation between Lender and Debtor. *See* Docket Nos. 24, 28. The Cash Collateral Stipulation provides that on August 15, 2021, Debtor would commence making adequate protection payments to Lender of $41,014, the amount of non-default interest and principal payable under the Loan. Lender and Debtor recently agreed to extend the cash collateral stipulation through February 28, 2022. *See* Docket Nos. 83, 89.

On June 28, 2021, Debtor filed its schedules of assets and liabilities and statement of financial affairs (Docket No. 310 (the "***Schedules and Statements***")). In addition to the secured claim of Lender, Debtor listed a $150,000 secured loan from the SBA on account of an Economic Injury Disaster Loan that Debtor obtained early in the COVID-19 pandemic without seeking Lender's prior written consent as required under the Loan Documents. Lender learned of the SBA claim when Debtor filed its Schedules and Statements.  Green Decl., ¶15. On Schedule E/F, Debtor listed eight unsecured claims, totaling just $26,395.10.

On Schedule A/B, Debtor claims that the Property is worth $13 million. On July 12, 2021, the Bankruptcy Court entered the *Order Granting Application of Debtor and Debtor-in-Possession to Employ Appraiser* (Docket No. 460), so that Debtor could obtain an appraisal of the Property. However, despite Debtor's representation that the appraisal was crucial to its reorganization prospects, Debtor has not produced any such appraisal to Lender or filed one with the Court.  Lender recently obtained an appraisal that values the Property as of December 1, 2021 at $7.4 million. *See* Evans Decl., Ex. A.  Thus, under the only competent evidence before the Court, Lender is substantially undersecured.

On July 26, 2021, Debtor received an SBA Shuttered Venue Operators Grant in the amount of $530,543. On or about October 28, 2021, Debtor obtained a second SBA Shuttered Venue Operators Grant in the amount of $265,271.40. Lender maintains that both grants constitute its cash collateral under the Loan Documents.

On September 15, 2021, Debtor commenced an Adversary Proceeding against Galaxy Theater seeking unpaid rent in the amount $1,199,296. Galaxy Theater is currently on a short-term, below-market lease that is set to expire December 31, 2021. Under the terms of the lease,

Lender's Memorandum in Support of Motion
for Relief from Automatic Stay
-7-
154968672.6

Galaxy Theater pays base rent in the amount of $35,000 (plus percentage rent to the extent it generates a profit), which is less than half of what it paid under its expired long-term lease, and $10,000 less than what Debtor projected in the cash collateral budget approved by the Court. Lender has been informed that Debtor and Galaxy Theater recently entered into another short-term, six-month lease extension with Galaxy Theater at an initial base rent of $35,000 per month, with rent escalating to $45,000 per month in the last two months of the lease term. Green Decl., ¶17.

On November 12, 2021, Lender, Debtor and Galaxy Theater participated in a court ordered mediation. The parties, however, were unable to reach an agreement on proposed plan terms or otherwise. Green Decl., ¶18.

### III.    DISCUSSION

Section 362(d) of the Bankruptcy Code provides multiple bases for creditors to seek relief from the automatic stay. 11 U.S.C. § 362(d). The burden of proof on all issues except the issue of equity in the debtor's property lies with the party objecting to relief from stay. *See* 11 U.S.C. § 362(g); *see also In re Dev., Inc.*, 36 B.R. 998, 1004 n.2 (Bankr. D. Haw. 1984); *Frankford Trust Co. v. Dublin Props. (In re Dublin Props.)*, 12 B.R. 77, 79 (Bankr. E.D. Pa. 1981). Where evidence warrants termination of the stay under any of the alternatives under section 362(d), the court must grant relief from the automatic stay. *See e.g., Albany Partners, Ltd. v. Westbrook (In re Albany Partners, Ltd.),* 749 F.2d 670, 673 (11th Cir. 1984); *see also Walter E. Heller W., Inc. v. Faires (In re Faires),* 34 B.R. 549 (Bankr. W.D. Wash. 1983). In this case, relief from stay is warranted under sections 362(d)(1) and (2).

### A.    "Cause" Exists to Grant Relief from Stay Under Section 362(d)(1)

Although "cause" is not defined in the Bankruptcy Code, courts have held that cause for relief from the automatic stay exists where a debtor commences a bankruptcy case in bad faith. *See In re Marsch*, 36 F.3d 825, 828 (9th Cir. 1994) ("Although section 1112(b) does not explicitly require that cases be filed in 'good faith,' courts have overwhelmingly held that a lack of good faith in filing a Chapter 11 petition establishes cause for dismissal."); *Laguna Assocs. Ltd. P'Ship v. Aetna Cas. & Sur. Co. (In re Laguna Assocs. Ltd. P'ship)*, 30 F.3d 734, 738 (6th

Cir. 1994); *Barclays-Am./Bus. Credit, Inc. v. Radio WBHP, Inc. (In re Dixie Broad., Inc.*,) 871 F.2d 1023, 1026 (11th Cir. 1989); *Duvar Apt., Inc. v FDIC (In re Duvar Apt., Inc)*., 205 B.R. 196, 200 (B.A.P. 9th Cir. 1996); *In re Walter*, 108 B.R. 244, 247 (Bankr. C.D. Cal. 1989).

### 1)    Two-Party Dispute

Evidence of bad faith may be found under circumstances where a debtor uses the bankruptcy process merely to frustrate the rights of creditors, particularly with respect to single asset cases, or to coerce unfair treatment. *See Shapiro v. Wilgus*, 287 U.S. 348, 356–57 (1932); *see also In re Prometheus Health Imaging, Inc.,* 705 F. App'x 626, 627 (9th Cir. 2017) ("[C]ourts may consider any factors which evidence an intent to abuse the judicial process and the purposes of the reorganization provisions, to make the bad faith determination.") (internal quotations omitted); *Official Comm. of Unsecured Creditors v. SGL Carbon Corp. (In re SGL Carbon Corp.)*, 200 F.3d 154, 162–64 (3d Cir. 1999); *Marsch*, 36 F.3d at 828–29 (9th Cir. 1994).

Courts also have found bad faith where the case was fundamentally a two-party dispute better suited for resolution in state court. *Oasis at Wild Horse Ranch, LLC v. Sholes (In re Oasis at Wild Horse Ranch, LLC)*, 2011 WL 4502102, at *10 (9th Cir. B.A.P. Aug. 26, 2011) ("[a] chapter 11 reorganization case has been filed in bad faith when it is an apparent two-party dispute that can be resolved outside of the Bankruptcy Court's jurisdiction."). Here, Debtor lists only eight unsecured claims totaling just $26,395.10, all of which it could have easily paid in full prior to Debtor's bankruptcy filing. Similarly, the monthly debt service on the SBA's EIDL is a negligible $713.00, which Debtor could have easily continued to pay outside of bankruptcy. These unsecured claims are inconsequential compared to Lender's claim of over $9.6 million as of the Petition Date. Debtor filed this case to stop Lender's scheduled foreclosure sale of the Property. *See* Transcript of J. Nelson 2004 Examination, Gamliel Decl., <u>Exhibit A</u>.[7] Providing a recovery for a handful of unsecured creditors, all of which could have been made whole before Debtor sought bankruptcy protection, has nothing to do with Debtor's decision to file this case.

---

[7]    Nelson 2004 Exam, Tr. 31:6-14 ("We discussed the status on an ongoing basis and that the lender…was attempting to foreclose on the property and that if there was not a way to stop the foreclosure and loss of that asset, that filing of Chapter 11 reorganization may be required to stop the loss of an asset through a foreclosure. And that was an ongoing discussion for a long time.").

Debtor's dispute with Galaxy Theater, which is purely contractual in nature and governed by California law, also did not warrant a bankruptcy filing. Galaxy Theater's lease with Debtor terminated pre-petition pursuant to its terms, and Debtor could have pursued its collections action in state court. In short, this chapter 11 case is essentially a two-party dispute between Lender and Debtor. Besides Galaxy Theater, no other unsecured creditor has participated in the chapter 11 case or sought relief from the bankruptcy court. And besides Lender, no other creditor will be significantly impacted by the bankruptcy. As such, the filing was and remains an "'abuse of the bankruptcy process . . . [and] the rights of [Lender]…involving conduct or situations only peripherally related to the economic interplay between the debtor and the creditor community.'" *Cedar Shore Resort, Inc. v. Mueller (In re Cedar Shore Resort, Inc.*,) 235 F.3d 375, 379 (8th Cir. 2000) (quoting 7 Collier on Bankruptcy ¶ 1112.07[1] (2000)) (citation omitted). Accordingly, the Court should lift the automatic stay and allow Lender to resolve its dispute with Debtor outside of bankruptcy.

### 2) Inability to Confirm a Plan

"Bad faith" may also be established where there is no likelihood of rehabilitation by the debtor. *See Fid. Assurance Ass'n v. Sims*, 318 U.S. 608, 618 (1943) (good faith found to be lacking on the ground that no reorganization was "reasonably to be expected."); *Wright v. Vinton Branch of Mountain Trust Bank of Roanoke, VA*, 300 U.S. 440, 462 n.6 (1937) ("[t]he offer of composition must be in good faith . . . and if the debtor is beyond all reasonable hope of financial rehabilitation, and the proceedings . . . cannot be expected to have any effect beyond postponing inevitable liquidation, the proceedings will be halted at the outset."); *In re Eden Assocs.*, 13 B.R. 578, 584-85 (Bankr. S.D.N.Y. 1981) (debtor found to have "abused the jurisdiction of [the] court" where debtor had single asset, no bona fide creditors, and no business). Dismissal of a chapter 11 case has been found appropriate where "a feasible plan is not possible." *In re 3 Ram Inc.*, 343 B.R. 113, 117 (Bankr. E.D. Pa. 2006) (citing §1112(b) generally). "If [a] chapter 11 [debtor] cannot achieve . . . reorganization within the statutory requirements of the Bankruptcy Code, then there is no point in expending estate assets on administrative expenses . . . ." *Id.* at 118. Here, Debtor will not be able to confirm a cramdown plan over Lender's objection or reinstate Lender's

Lender's Memorandum in Support of Motion
for Relief from Automatic Stay
-10-
154968672.6

Loan and thus render it unimpaired. Nor will Debtor be able to demonstrate plan feasibility. As a result, there is no hope for Debtor beyond postponing an inevitable liquidation.

### a.    Lender's Consent Required to Confirm Plan

In order to confirm a cramdown plan of reorganization, at least one impaired consenting class must vote in favor of the plan. 11 U.S.C. § 1129(a)(10). Based on the recent appraised value of the Property, Lender expects to have a deficiency claim of approximately $2.2 million, which easily places it in blocking position *vis a vis* any contemplated class of general unsecured creditors.[8] Because Lender will dominate the unsecured creditor class and vote against any plan that Debtor may propose, Debtor will be unable to confirm a plan of reorganization.

As noted above, Nelson has represented that, as a retiree with limited sources of income, he is essentially judgment proof. He has also challenged the enforceability of his guaranty. Given that Debtor bears the burden of establishing that a non-debtor third-party guaranty carries value and therefore warrants separate classification of Lender's deficiency claim, Debtor will not be able to separately classify Lender's deficiency claim. *In re NNN Parkway*, 505 B.R. 277, 284 (C.D. Cal. 2014) (held that a guaranty from an insolvent guarantor cannot alone support separate classification and burden of persuasion to demonstrate guarantor's solvency lies with debtor).

*In re 4th Street E. Inv'rs, Inc.*, 2012 WL 1745500, at *10 (Bankr. C.D. Cal. May 15, 2012) is instructive. There, the court disallowed separate classification of the secured lender's deficiency claim. In *4th Street*, the debtor had a single employee and owned a storage facility with severable rentable storage units. There, as here, the secured creditor had a significant deficiency claim that would control the unsecured class if it were not separately classified. The bankruptcy court in *4th Street* concluded that (i) the court was not required to approve separate classification as a matter of law, and (ii) because the secured creditor claim was not collectible from a non-debtor source, the debtor had not shown there was a sound reason for separate classification.

---

[8]    Based on the value of the Property, the claim of the SBA will be completely unsecured and must be classified with other general unsecured claims, including Lender's deficiency claim.

Lender's Memorandum in Support of Motion
for Relief from Automatic Stay
-11-
154968672.6

1   Debtor is also barred from separately classifying the EIDL from the general unsecured

2   claims. In a case with similar facts, *In re Reid Park LLC*, 2012 WL 5462919 (Bankr. D. Ariz.

3   July, 18, 2012), the bankruptcy court considered the classification of the claims of a partially

4   secured senior lender and a wholly undersecured junior lender. The bankruptcy court held that

5   there was no basis for separately classifying the lender's deficiency claim and the undersecured

6   junior lender's claim from the general unsecured claims where the bankrupt guarantor was not a

7   "viable" source of repayment. 2012 WL 5462919, at *2 ("Separate classification of [senior

8   lender's] deficiency claim and [junior lender's] wholly unsecured claim… instead of…general

9   unsecured claims is not justified just because both claims are guaranteed by Debtor's

10  principal…here the Guarantor is insolvent and a individual chapter 11 debtor. Accordingly, there

11  is no basis to assume [senior lender] and [junior lender] have another viable source of repayment

12  for their unsecured claims.").

13  The same reasoning applies in this case. Here, Nelson has repeatedly maintained that he is

14  judgment proof. Gamliel Decl., ¶6. He has even gone so far as to challenge the enforceability of

15  the Guaranty. *See* Gamliel Decl., Ex. A, Nelson 2004 Exam, Tr. 140: 5–18. Accordingly, Debtor

16  has no legitimate basis to classify either Lender's deficiency claim or the SBA's wholly

17  unsecured claim separately from the general unsecured claims. As Lender's deficiency claim of

18  approximately $2.2 million far exceeds the combined amount of other general unsecured claims,

19  Lender will control the general unsecured creditor class. Consequently, Debtor cannot obtain an

20  impaired consenting class without Lender's affirmative vote.

21  **b.    *Debtor Unable to Propose a Feasible Plan***

22  Section 1129(a)(11) of the Bankruptcy Code requires that a plan be feasible.  Specifically,

23  the bankruptcy court must determine that:

24  [c]onfirmation of the plan is not likely to be followed by the

25  liquidation, or the need for further financial reorganization, of the

26  debtor or any successor to the debtor under the plan, unless such

27  liquidation or reorganization is proposed in the plan.

28

Lender's Memorandum in Support of Motion
for Relief from Automatic Stay

154968672.6

11 U.S.C. § 1129(a)(11). This requirement, commonly known as the "feasibility" standard, requires that a plan have a reasonable chance of success. Generally, to satisfy a feasibility analysis a debtor must show that (1) a debtor will have enough cash on the effective date of a plan to pay all claims entitled to be paid on that date and (2) no further financial reorganization of the debtor will be needed. While it is not necessary that success be guaranteed, a plan must present a workable scheme of reorganization and operation from which there may be a reasonable expectation of success. *In re Drexel Burnham Lambert Group, Inc.,* 138 B.R. 723, 762 (Bankr. S.D.N.Y. 1992).

Debtor is already falling short of its projected rental income. According to its Cash Collateral Budget, Debtor estimated that the Property would generate monthly operating income ranging from $55,287 to $66,287 for each full month of operation. Based on the Monthly Operating Reports for July through November 2021 (each full month Debtor has been in chapter 11), the ordinary, recurring monthly rental payments (which is a more accurate measure of Debtor's future performance) reflect that Debtor has only generated average monthly income of $38,492 and aggregate recurring rental income of $192,462.[9] Looking at just the most recent month of November, Debtor generated ordinary rental and CAM income of $53,947. While this revenue is marginally more than the monthly non-default payment owed to Lender, it leaves insufficient revenue for Debtor to pay other expenses, such as operating expenses, taxes, and

---

[9]  This estimate of ordinary monthly rental payments is based on the below payments shown on each Schedule of Cash Receipts and Disbursement attached to each relevant MOR. Payments that were marked as make up payments from earlier periods were excluded. Payments on account of the SVOG were similarly excluded. Ordinary rental payments were calculated as follows:

|  | July 2021 | August 2021 | September 2021 | October 2021 | November 2021 |
|---|---|---|---|---|---|
| Galaxy Theater | - | $10,000 | $30,000 | $30,000 | $35,000 |
| Que Pasa Restaurants (Cisernos Restaurant, Inc.) | $11,671 | $11,671 | $11,671 | $11,671 | $11,671 |
| SloDoCo (Pickering Enterprise, Inc.) | - | $7,163 | $7,389 | $7,276 | $7,276 |
| Monthly Rent | $11,671 | $28,835 | $49,061 | $48,948 | $53,947 |

| | | Aggregate Rent | $192,462 |
|---|---|---|---|
| | | Average Rent | $38,492 |

insurance, and to make necessary capital expenditures. And Nelson admitted additional capital expenditures are going to be necessary to attract new tenants, as there has been a "relentless deterioration of the unoccupied spaces."[10] Debtor, then, is faced with the age-old problem of needing money to make money. These anticipated capital expenditures on top of the weak rental incomes generated by existing tenants suggests that Debtor cannot propose a feasible reorganization. Debtor's operations simply do not generate the income necessary for funding a chapter 11 plan.

Debtor has further demonstrated limited ability to attract new tenants both before and during the Covid-19 pandemic. Accordingly, it appears that, absent a substantial infusion of capital by one or more of Debtor's principals (which Nelson apparently lacks), Debtor's ability to generate sufficient rental income to fund a chapter 11 plan hinges on one tenant—Galaxy Theater.[11] Yet Galaxy Theater is currently paying rent of just $35,000 per month, significantly less than its $75,581 in monthly rent under its original lease.[12]

In order to make the required monthly debt service payments and pay for property taxes, insurance and operating expenses, Galaxy Theater would have to agree to enter into a long-term lease that pays closer to its original rent. Further, given the Loan's January 6, 2026 maturity date, the lease would have to extend for at least another four years. However, it seems unlikely that Galaxy Theater will be able to pay rent at the level required to fund a potential chapter 11 plan. Accordingly, Debtor will be unable to demonstrate that it will be able to generate rental revenue that could cover the required debt service payment.

---

[10] Nelson 2004 Exam, Tr. 95: 3-11.

Q: And why would you say the unoccupied spaces, the condition is not very good? What sort of work is required, deferred maintenance or otherwise, on those spaces?

A: They look old. They have interior finishes that are old that relate to the origin of the theater. There's been a water leak in the ceiling. Anyway, things happened. There's a relentless deterioration of unoccupied spaces, I would say.

[11] Debtor also cannot satisfy the absolute priority rule if Nelson retains any ownership interest.

[12] *See* Complaint for Breach of Contract [Docket No. 62].

Lender's Memorandum in Support of Motion
for Relief from Automatic Stay
-14-
154968672.6

### c.      *Reinstatement Not Possible*

Reinstating a prepetition loan requires that a chapter 11 plan keep in place the loan with no change to maturity, interest rate, covenants or any other terms as they originally existed before the bankruptcy filing. 11 U.S.C. §1124(2); *In re Charter Communications*, 419 B.R. 221, 244 (Bankr. S.D.N.Y. 2009). Any change to Lender's rights under the Loan Documents is an impairment, which gives Lender the right to vote on a plan of reorganization.  *In re L&J Anaheim Assoc's*, 995 F.2d 940, 942–43 (9th Cir. 1993) ("'[A]ny alteration of the rights constitutes impairments even if the value of the rights is enhanced.'") (internal quotation omitted). Here, section 5.22 of the Loan Agreement provides that Debtor (as Borrower) shall not incur any additional indebtedness besides the Loan.[13] Debtor cannot fully restore Lender's rights without removing the subordinate debt imposed by the EIDL. Because incurring additional debt was a material, nonmonetary default that cannot be cured, Debtor is barred from reinstating the loan. *Cf. Worthington v. General Motors Corp. (In re Claremont Acquisition Corp., Inc.)*, 113 F.3d 1029, 1034-35 (9th Cir. 1997) (finding that failing to operate franchise was not a default that could be cured and that assumption was therefore bared).

Reinstatement also requires that Debtor cure all outstanding defaults under the Loan, which Ninth Circuit law requires be done at the default interest rate. *See In re New Invs., Inc.*, 840 F.3d 1137, 1140–42 (9th Cir. 2016). In *New Investments.*, the Ninth Circuit considered whether a debtor's proposed treatment of curing defaults at the prepetition, non-default rate rendered the lender unimpaired. The Ninth Circuit relied on section 1123(d), which requires a cure to "be determined in accordance with the underlying agreement and applicable nonbankruptcy law." *New Invs.*, 840 F.3d at 1141; 11 U.S.C. § 1123(d). The Ninth Circuit then determined that under the applicable state law, cure required payment of missed interest payments at the default rate. In particular, the Ninth Circuit reasoned:

---

[13]  "**5.22 <u>Indebtedness</u>.**  Borrower shall not directly or indirectly create, incur or assume any indebtedness other than (i) the Debt and (ii) unsecured trade payables incurred in the ordinary course of business relating to the ownership and operation of the Property, which in the case of such unsecured trade payables (A) are not evidenced by a note, (B) do not exceed, at any time, a maximum aggregate amount of one percent (1%) of the original amount of the Principal and (C) are paid within thirty (30) days of the date incurred (collectively, "***Permitted Indebtedness***")."")

What § 1123(d) affects is how a debtor returns to pre-default conditions, which can include returning to a lower, pre-default interest rate… the borrower does not effectuate a cure merely by paying past due installments of principal at the pre-default interest rate. Rather, the borrower's cure obligations may also include "late charges, attorneys' and trustee's fees, and publication and court costs." Restatement (Third) of Property (Mortgages) § 8.1 cmt. c; *see also* Wash. Rev. Code Ann. § 61.24.090(1)(b). It is only once these penalties are paid that the debtor can return to pre-default conditions as to the remainder of the loan obligation.

*New Invs.*, 840 F.3d at 1141–42. While *New Investments* was decided under Washington state law, the same result would obtain under either California or New York law. *See In re 3MB, LLC*, 609 B.R. 841, 848 (Bankr. E.D. Calif. 2019) ("California law allows a creditor to recover default interest from a borrower."); *In re 53 Stanhope LLC*, 625 B.R. 573, 578 (Bankr. S.D.N.Y. 2021) ("[] New York law…. will generally enforce unambiguous contract provisions for default interest at a higher rate than pre-default interest, even if the default interest is at a high rate and reflects a large spread against non-default interest.").

Even if the Court were to decide that reinstatement was possible, Debtor would be required to cure at the default rate — payments Debtor is unable to fund given its current available cash on hand. Because Debtor cannot reinstate the Loan, Lender will be entitled to vote on a chapter 11 plan, and, as set forth above, Lender will object to any plan that does not propose fair treatment for its claim.

**B.** **Relief from Stay is Warranted Pursuant to Section 362(d)(2) Because Debtor Lacks Equity in the Property and Cannot Successfully Reorganize**

Under 362(d)(2), the Court must grant relief from the automatic stay if: (1) Debtor does not have any equity in the Property; and (2) the Property is not necessary to an effective plan of reorganization. *See* 11 U.S.C. § 362(d); *see, e.g., In re Egea*, 167 B.R. 226, 230 (Bankr. D. Kan. 1994). Lender must demonstrate that there is no equity in the Property while Debtor bears the

burden of proving that the Property is necessary to an effective plan of reorganization. *See* 11 U.S.C. § 362(g); *see also Dublin*, 12 B.R. 77; *Dev., Inc.*, 36 B.R. 998.

### 1.    There Is No Equity in the Property

A debtor has no equity in the property when the debt secured by liens on the property exceed the value of the property. *See Stewart v. Gurley*, 745 F.2d 1194, 1195 (9th Cir. 1984). Debtor states without support that the Property has a value of $13 million dollars. That valuation, which is simply based upon Debtor's purchase price in December 2015, is grossly overstated. According to the C&W Appraisal, the Property is worth only $7.4 million, significantly less than Lender's claim of $9,616,613.28 and SBA's EIDL claim of $155,563.36. Thus, Debtor has no equity in the Property.

### 2.    The Property is Not Necessary to an Effective Reorganization Because Debtor Cannot Confirm a Plan in a Reasonable Time

To establish that property is necessary to an effective plan of reorganization, the debtor bears the burden of proving that there is a reasonable possibility of a successful reorganization within a reasonable time, and that the property at issue is necessary to that reorganization. *See United Savings Ass'n of Texas v. Timbers of Inwood Forest Assoc's, Ltd,* 484 U.S. 365, 375–76 (holding that section 362(d) requires "reasonable possibility of a successful reorganization within a reasonable time."). The debtor must do more than simply claim that no reorganization is possible without the property. *See id.* If, for instance, the reorganization of an entity is not feasible or creditor dissent makes a successful plan unlikely, then there is no reasonable likelihood of reorganization. *See Sun Valley Ranches, Inc. v. Equitable Life Assurance Soc'y of the United States (In re Sun Valley Ranches, Inc.)*, 823 F.2d 1373 (9th Cir. 1987); *see also Pegasus Agency, Inc. v. Grammatikakis (In re Pegasus Agency, Inc.)*, 101 F.3d 882 (2d Cir. 1996). In sum, effective reorganization requires a showing that confirmation of a proposed reorganization plan in the near future is within the realm of possibility. *See In re Teresi*, 134 B.R. 392, 398 (Bankr. E.D. Cal. 1991).

As stated above, Debtor cannot propose a confirmable plan without Lender's consent. Moreover, in the absence of a substantial equity infusion or a long-term lease with Galaxy

1   Theater at closer to pre-pandemic rent levels, Debtor has no ability to propose a feasible plan.

2   Therefore, relief from stay is also appropriate under section 362(d)(2).

3                                    **IV.    CONCLUSION**

4          For the foregoing reasons, Lender respectfully requests that this Court grant its Lift Stay

5   Motion so that Lender may exercise its rights and remedies under the Loan, including foreclosing

6   on the subject Property.

7   DATED:  January 10, 2021                    **PERKINS COIE LLP**

8

9                                               By:  /s/ *Amir Gamliel*
                                                     Amir Gamliel, Bar No. 268121
10                                                   AGamliel@perkinscoie.com

11                                              Attorneys for Lender
                                                Wilmington Trust, National Association, as
12                                              Trustee, for the benefit of the Holders of
                                                COMM 2016-DC2 Mortgage Trust
13                                              Commercial Mortgage Pass
                                                Through Certificates, Series 2016-DC2

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                                              Lender's Memorandum in Support of Motion
                                                         for Relief from Automatic Stay
154968672.6                          -18-