David M. Neff, IL Bar No. 6190202
(*admitted pro hac vice*)
DNeff@perkinscoie.com
Amir Gamliel, CA Bar No. 268121
AGamliel@perkinscoie.com
PERKINS COIE LLP
1888 Century Park E., Suite 1700
Los Angeles, CA  90067-1721
Telephone:  310.788.9900
Facsimile:  310.788.3399

Attorneys for Lender
Wilmington Trust, National Association, as Trustee,
for the benefit of the Holders of COMM 2016-DC2
Mortgage Trust Commercial Mortgage Pass
Through Certificates, Series 2016-DC2

UNITED STATES BANKRUPTCY COURT

CENTRAL DISTRICT OF CALIFORNIA

NORTHERN DIVISION

| | |
|---|---|
| In re | CASE NO. 9:21-BK-10634 DS |
| Cinema Square, LLC, | Chapter: 11 |
| Debtor. | **DECLARATION OF AMIR GAMLIEL IN SUPPORT OF LENDER'S MOTION FOR RELIEF FROM STAY** |

Date:         February 8, 2022
Time:         11:30 AM
Judge:        Deborah J. Saltzman
Courtroom:    1415 State Street
              Court room 201
              Santa Barbara, CA 93101
              via Zoom.gov

I, Amir Gamliel, declare as follows:

1.      I am an attorney at law, duly licensed to practice before all the courts of the State of

California and before this Court.  I am a Partner at Perkins Coie LLP, counsel for lender Wilmington

Trust, National Association, as Trustee, for the benefit of the Holders of COMM 2016-DC2

DECLARATION OF AMIR GAMLIEL

1  Mortgage Trust Commercial Mortgage Pass Through Certificates, Series 2016-DC2 ("*Lender*") in

2  the above-referenced matter.  The facts stated herein are based on my own personal knowledge.  If

3  called to testify, I could and would testify competently to the facts stated herein.

4       2.     Attached hereto as <u>Exhibit A</u> are excerpts from the transcript of the 2004 Exam of

5  Jeffrey Nelson that I took remotely on September 1, 2021.

6       3.     On January 3, 2022, I received correspondence from Debtor's counsel stating that

7  Yogurtland Creations had paid some initial reduced amounts under its lease but has since stopped

8  paying rent or communicating with Debtor.

9       4.     Prior to retaining personal representation in the Guarantor Lawsuit, Mr. Nelson

10  represented that he was judgment proof.  Furthermore, Mr. Nelson has disputed the validity of the

11  Recourse Guaranty under California law.

12       I declare under penalty of perjury under the laws of the United States of America and

13  California that the foregoing is true and correct.

14       Executed this 6th day of January 2022, in Los Angeles, California.

15

16                            By:  */s/ Amir Gamliel*
                          Amir Gamliel, Bar No. 268121

17                            AGamliel@perkinscoie.com

18

19

20

21

22

23

24

25

26

27

28

DECLARATION OF AMIR GAMLIEL

155292970.1

# EXHIBIT A

```
 1                 UNITED STATES BANKRUPTCY COURT

 2                CENTRAL DISTRICT OF CALIFORNIA

 3                      SANTA ANA DIVISION

 4                             - - -

 5     In re                        )
                                    )
 6     CINEMA SQUARE, LLC,          ) No. 9:21-BK010634-DS
                                    )
 7                       Debtor.    )
                                    )
 8

 9

10

11

12

13                         DEPOSITION OF

14                         JEFFREY NELSON

15               Wednesday, September 1, 2021

16

17

18

19

20

21

22     Reported By:

23     MICHELLE K. BAILEY

       RPR, CSR No. 10713

24     Job No. 4764685

25     Pages 1 - 156
```

Page 1

1              UNITED STATES BANKRUPTCY COURT

2              CENTRAL DISTRICT OF CALIFORNIA

3                  SANTA ANA DIVISION

4                        - - -

5      In re                          )

                                      )

6      CINEMA SQUARE, LLC,            ) No. 9:21-BK010634-DS

                                      )

7                    Debtor.          )

                                      )

8

9

10

11

12          Deposition of JEFFREY NELSON, taken on behalf

13    of the Creditor, beginning at 9:37 a.m., and ending at

14    2:06 p.m., on Wednesday, September 1, 2021, before

15    MICHELLE K. BAILEY, RPR, CSR No. 10713.

16

17

18

19

20

21

22

23

24

25

                                                    Page  2

```
 1    APPEARANCES:

 2    For the Debtor:

 3         BEALL AND BURKHARDT, APC
           BY:  WILLIAM C. BEALL, ESQ.

 4         1114 State Street
           Suite 200

 5         Santa Barbara, California  93101
           805.966.6774

 6         will@beallandburkhardt.com

 7
      For the Creditor:

 8
           PERKINS COIE

 9         BY:  AMIR GAMLIEL, ESQ.
           1888 Century Park East

10         Suite 1700
           Los Angeles, California  90067

11         (310) 788-9900
           agamliel@perkinscoie.com

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Page  3

```
 1                        I N D E X

 2     WITNESS:  JEFFREY NELSON

                                                        PAGE
 3

       EXAMINATION BY MR. GAMLIEL                         5
 4

 5

 6                      E X H I B I T S

 7     EXHIBIT NO.           DESCRIPTION               PAGE

 8     Exhibit 1      List of officers, ownership,       9
                      general partners, and limited
 9                    partners

10     Exhibit 2      Operating Agreement of Cinema      31
                      Square, LLC

11

       Exhibit 3      Loan Agreement, dated             113
12                    12/31/2015

13     Exhibit 4      Letter of Agreement, dated        128
                      6/12/2020

14

       Exhibit 5      Lender's Proof of Claim           148
15

16

17

18

19

20

21

22

23

24

25
```

                                                   Page  4

```
 1                    WEDNESDAY, SEPTEMBER 1, 2021

 2                           9:37 A.M.

 3

 4                    JEFFREY NELSON,

 5              having first been duly sworn

 6             by the reporter, was examined

 7               and testified as follows:

 8

 9                         EXAMINATION

10    BY MR. GAMLIEL:

11         Q.  Good morning, Mr. Nelson.

12         A.  Morning.

13         Q.  As you know, I'm here today on behalf of the

14    secured lender, Wilmington Trust, as trustee.  My name

15    is Amir Gamliel.  I'm a partner at Perkins Coie, LLP.  I

16    will be conducting this examination today.

17              Mr. Nelson, have you been deposed before?

18         A.  Yes.

19         Q.  How many times have you had your deposition

20    taken?

21         A.  Maybe three or four times.

22         Q.  Can you tell me a little bit about the context

23    in which you've been deposed?

24         A.  Spans over many years, and it's related to

25    things that I was involved in in one fashion or another.
```

Page 5

[*Excerpt on Following Page*]

1    sole member authorized the bankruptcy filing.  I

2    certainly did not see any membership consent or

3    authorization to the bankruptcy filing at the Cavaletto

4    Family, LP, level.

5          And I do think you have to go to the next level

6    and obtain the consent of the general partners and

7    limited partners, to the sole member authorizing the

8    bankruptcy filing of Cinema Square, LLC.

9          MR. BEALL:  I understand what you're asking

10   for.

11   BY MR. GAMLIEL:

12      Q.  Were there any discussions or meetings that

13   took place amongst the general or limited partners of

14   Cavaletto Family, LP, before Cinema Square, LLC, decided

15   to file for bankruptcy?

16      A.  Yes.

17      Q.  And when did those discussions take place?

18      A.  Over time prior to the filing between Larry

19   Cavaletto and I.

20      Q.  So fair to say those discussions were primarily

21   between you and Larry Cavaletto, not involving the other

22   partners?

23      A.  Correct.

24      Q.  And I'm not interested in any conversations

25   that you had with Mr. Cavaletto with Mr. Bell present or

Veritext Legal Solutions
866 299-5127

1    at his direction.  But can you tell me a little bit

2    about those discussions and those conversations you had

3    in the period of time leading up to the bankruptcy file

4    as to the why the debtor should file for bankruptcy and,

5    in fact, did file for bankruptcy?

6         A.   We discussed the status on an ongoing basis and

7    that the lender or someone acting on behalf of the

8    lender was attempting to foreclose on the property and

9    that if there was not a way to stop the foreclosure and

10   loss of that asset, that filing of a Chapter 11

11   reorganization may be required to stop the loss of an

12   asset through a foreclosure.   And that was an ongoing

13   discussion for a long time.

14        Q.   And did Mr. Cavaletto sign any written

15   authorization approving the bankruptcy filing of Cinema

16   Square, LLC?

17        A.   Yes.

18        Q.   And, again, you'll produce that to us through

19   your counsel?

20        A.   Yes.

21        Q.   Okay.

22        MR. GAMLIEL:  I'd like to go ahead and mark as

23   Exhibit 2 the limited liability company operating

24   agreement of Cinema Square, LLC.

25        (Exhibit 2 marked)

Veritext Legal Solutions
866 299-5127

1    BY MR. GAMLIEL:

2         Q.   Okay.

3              The exhibit has been stamped Exhibit 2.  It

4    should be making its way over to you.  And it consists

5    of two operating agreements for Cinema Square, LLC.  Let

6    me know when you've received what has now been marked as

7    Exhibit 2.

8              MR. BEALL:  I have it, by the way, for what

9    that's worth.

10             MR. GAMLIEL:  Thank you, Mr. Beall.

11             THE WITNESS:  It's just downloading now.  Okay.

12   BY MR. GAMLIEL:

13        Q.   Now, Exhibit 2 consists of two sets of

14   operating agreements.  One looks like it was dated

15   December 9th, 2015, and the second one, which is more

16   robust, appears to be dated as of December 30th, 2015.

17             Do you have -- have you seen Exhibit 2 before?

18        A.   Probably not since December of 2015.

19        Q.   Do you know who prepared these LLC agreements?

20        A.   I believe it was the law firm of Sheffield and

21   Rogers.

22             MR. BEALL:  I believe it's actually Rogers &

23   Sheffield.

24             THE WITNESS:  There you go.  Thank you.

25   ///

Veritext Legal Solutions
866 299-5127

[*Excerpt on Following Page*]

1          And how about the other tenants?  Did they pay

2    as part of the CAM charges the portion, pro rata share

3    of property taxes?

4          A.   They do, yes.  For the leased spaces they do.

5          Q.   Okay.

6          Well, now that the theater is on a month to

7    month, did you consider including that as part of the

8    amendment to the lease, that they would pay the property

9    tax assessment each month?

10         A.   Yes.

11         Q.   And what was the result of those discussions?

12   They pushed back and said, we're only willing to pay 30,

13   35 grand a year -- a month?

14         MR. BEALL:  They wanted to pay $10,000 a month,

15   and that was just the taxes.

16         THE WITNESS:  Right.  They said, okay, we'll

17   reduce the rent we pay you by 10,000 if you want two

18   separate payments.  But they weren't going to pay us any

19   more to take down the property tax obligation.  That's

20   certainly open to discussion on the next lease.

21   BY MR. GAMLIEL:

22         Q.   Okay.

23         What's the current condition of the property?

24   How would you describe to me the property condition?

25   Good?  Fair?  Excellent?

Page 94

1        A.   I would say pretty good for the occupied

2    spaces.  Not very good on the unoccupied spaces.

3        Q.   And why would you say the unoccupied spaces,

4    the condition is not very good?  What sort of work is

5    required, deferred maintenance or otherwise, on those

6    spaces?

7        A.   They look old.  They have interior finishes

8    that are old that relate to the origin of the theater.

9    There's been a water leak in the ceiling.  Anyway,

10   things happened.  There's a relentless deterioration of

11   unoccupied spaces, I would say.

12       Q.   And have there been any discussions about

13   capital expenditures to renovate or improve those spaces

14   maybe as an effort to try to find tenants?

15       A.   It was -- it's always been -- don't do

16   something that the actual tenant won't want.  So we've

17   actually even considered painting walls, but then the

18   next tenant would come in and say, I do like that paint

19   color.  So, anyway, it's always tricky to guess at

20   someone who has not expressed interest on what they

21   would want.

22       Q.   That's a chicken or the egg problem.

23       A.   Yes.

24       Q.   Your counsel mentioned business interruption

25   insurance and efforts to pursue a claim against the

Page 95

1   insurer.  I know that you've provided in documents

2   certain exchanges that you've had with the insurer or

3   insurer's agent.

4         Have there been any further discussions

5   recently about -- whether in writing or otherwise,

6   regarding business interruption insurance?

7         A.  We have communicated with the insurance broker

8   that we want to file another claim for the next period.

9   So we had 2020 denied, and it merits filing a claim,

10  even though we'll get a denial for 2021.  So that's one

11  of the many things that's been ongoing here and will

12  come to fruition pretty soon, I think, where it will

13  prompt a 30-day denial from the insured.

14        Q.  Palomar Insurance is one of the insurers;

15  right?  Or is the insurer?

16        A.  I forget which role they have again.

17        Q.  Have you looked at the -- I don't want to

18  attach as an exhibit if I don't have to the entire

19  policy.  But have you looked at the exclusions under

20  that policy to determine whether or not there may be a

21  specific exclusion that governs here?

22        A.  Yes.  So from my research, there are two

23  different categories of policies, some of which really

24  have pandemic exclusions, and others that do not, where

25  you have to go back to general language.  So ours has

Veritext Legal Solutions
866 299-5127

[*Excerpt on Following Page*]

1    let you ask that.

2            MR. GAMLIEL:  No.  I want to know if that's his

3    company.

4            MR. BEALL:  The objection stands.

5            Don't answer it.

6            MR. GAMLIEL:  Are you going to --

7            MR. BEALL:  You're not allowed to do personal

8    inquiry into his assets.

9            MR. GAMLIEL:  I am not doing any personal

10   inquiries of his assets.  I want to understand the

11   debtor's s wherewithal to emerge from Chapter 11.  I

12   want to know what connection Mr. Nelson has as a key

13   principal of the debtor to the Oak Creek Company.

14           MR. BEALL:  The objection stands.

15   BY MR. GAMLIEL:

16       Q.  And, Mr. Nelson, are you going to heed your

17   counsel's advice?

18       A.  Yes.

19           MR. GAMLIEL:  Well, I am not going to end this

20   examination.  It will be adjourned at the conclusion of

21   today pending my right and ability to move to compel

22   further testimony on this issue.

23           I'll move on now, with that caveat.

24   BY MR. GAMLIEL:

25       Q.  Turning to paragraph 3 of this letter

Page 139

1    agreement, which you reviewed and signed, do you see

2    that the paragraph 3 is entitled "The Loan Documents in

3    Force"?

4         A.   Yes.

5         Q.   And do you understand that you agreed that the

6    loan agreements are in full force and effect and are

7    binding on the borrower, except for the loan documents

8    meant to be binding, only on the guarantor of the loan

9    in accordance with their term, you being the guarantor?

10   Do you understand that you agreed to that?

11        A.   Let me answer it this way.  We were presented

12   with this letter and told by our representative, who was

13   going to negotiate with the special servicer, that it

14   was nonnegotiable.  And it was basically a letter of

15   adhesion, or whatever you would call it.  But we had no

16   ability to negotiate this, and if we wanted to engage

17   the special servicer to try to work out a deal because

18   of the pandemic, we had to sign it.

19        Q.   Did you try to negotiate?

20        A.   No.  And we were told that we did not have the

21   ability to negotiate.

22        Q.   By whom?

23        A.   By First Services Solutions, a party that

24   negotiates on behalf of borrowers with CMBS lenders.

25        Q.   Paragraph 4 of the agreement, the letter

Page 140

1   agreement on Exhibit 4, says "status of obligation."

2   About midway through paragraph 4, starting with:

3   "Borrower hereby acknowledges and agrees that there have

4   been no modifications to the loan documents, other than

5   as set forth in writing and signed by holder or holder's

6   predecessor in interest, and the loan documents

7   constitute all of the agreements among holder and

8   borrower, and the loan documents continue to constitute

9   borrower's legal and enforceable obligation."

10          Do you see that?

11      A.   Yes.

12      Q.   And you agreed to that; right?

13      A.   The lender wrote this.  We were told we had to

14   sign this to engage CWCapital to try to work out

15   something in relation to the impact of the pandemic on

16   this property.

17      Q.   What would have happened if you didn't sign the

18   agreement?

19      A.   We would not have been able to engage CW in a

20   discussion about our loan.

21      Q.   Why did you need to engage CW if you contended

22   that the loan documents were not enforceable, either

23   based on impossibility or frustration of purpose

24   defense?

25      A.   Every single borrower was in a position of

Page 141